16-2999-cv (L)
Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.

# United States Court of Appeals
# for the Second Circuit

August Term 2017

(Argued: May 29, 2018     Decided: September 19, 2018)

Docket Nos. 16-2999-cv, 17-2484-cv


HARTFORD ROMAN CATHOLIC DIOCESAN CORPORATION,

PLAINTIFF-APPELLEE-CROSS-APPELLANT,

- V.-

INTERSTATE FIRE & CASUALTY COMPANY,

DEFENDANT-APPELLANT-CROSS-APPELLEE.


Before:     JACOBS, CHIN, Circuit Judges, KUNTZ, District Judge.*

Interstate Fire & Casualty Company ("Interstate") appeals from an August 1, 2016 judgment that Interstate breached its contractual duty to indemnify the Hartford Roman Catholic Diocesan Corporation ("Archdiocese") under certain excess insurance policies.  The Archdiocese appeals from a July 26, 2017 amended judgment that Interstate's breach did not violate the Connecticut Unfair Insurance Practices Act ("CUIPA").  We affirm.

---

* Judge William F. Kuntz of the United States District Court for the Eastern District of New York, sitting by designation.

DAVID P. FRIEDMAN (Marilyn B. Fagelson, Melissa A. Federico, on the brief), Murtha Cullina LLP, Stamford, CT, for Appellee-Cross-Appellant Hartford Roman Catholic Diocesan Corporation.

RICHARD L. NEUMEIER, Morrison Mahoney LLP, Boston, MA, for Appellant-Cross-Appellee Interstate Fire and Casualty Company.

JACOBS, Circuit Judge:

This diversity suit concerns insurance under second-layer excess liability contracts, issued 1978-85, for four claims that were brought against the insured, the Hartford Roman Catholic Diocesan Corporation ("Archdiocese"), and that arose from sexual misconduct by priests of the Archdiocese. Interstate Fire & Casualty Company ("Interstate") appeals from an August 1, 2016 judgment of the United States District Court for the District of Connecticut (Arterton, J.) that Interstate breached its contractual duty to indemnify. The Archdiocese appeals from a July 26, 2017 amended judgment dismissing its claim that Interstate violated the Connecticut Unfair Insurance Practices Act ("CUIPA") in its handling of the claims. We affirm the judgment and amended judgment.[1]

The coverage dispute focuses on two contract provisions invoked by Interstate to deny coverage for sexual abuse: the exclusion for assault and battery, and the coverage grant for occurrences that unintentionally and unexpectedly result in personal injury. The CUIPA claim alleges that Interstate failed to comply with the obligation to make prompt reimbursement.

---

[1] "Because we think that we can determine th[ese] issue[s] based on well-settled principles" of Connecticut law, there is no need to take the discretionary action to certify any questions to the Connecticut Supreme Court, as sought by Interstate. Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 n.3 (2d Cir. 2007).

2

# I

The Archdiocese purchased excess indemnity insurance policies from Interstate for the periods between September 1, 1978 and September 1, 1985. Under its insurance plans, the Archdiocese had a self-insured retention; the first layer excess was furnished by underwriters at Lloyds of London and other London market insurers (collectively "Lloyds") and by Centennial Insurance Company; and the second excess layer was furnished by defendant Interstate. Interstate's policies followed form to Lloyds' policies (except as to any inconsistency, of which none is at issue). At some point, Interstate's second excess layer was breached.

Beginning in 2008, Interstate received notice from the Archdiocese that the four underlying claimants at issue in this suit had sent demand letters to the Archdiocese seeking damages for sexual abuse inflicted by priests. After timely notice to Interstate, and after settling with the four victims, the Archdiocese informed Interstate of the amount of reimbursement sought.

On November 19, 2012, having received no reimbursement from Interstate for any of the four underlying claims, the Archdiocese filed suit alleging breach of contract, breach of the covenant of good faith and fair dealing, and violations of CUIPA and Connecticut Unfair Trade Practices Act ("CUTPA"). Interstate's Answer admitted that each underlying claimant alleged sexual abuse by a priest of the Archdiocese and asserted affirmative defenses.

Interstate moved for summary judgment on all counts based on the assault and battery exclusion, while the Archdiocese cross-moved for summary judgment on breach of contract. Interstate's motion was denied; the Archdiocese's motion was granted in part and denied in part. After a ten-day trial, the district court found that Interstate breached its contract to indemnify, but did not violate CUIPA, CUTPA, or the covenant of good faith and fair dealing. The Archdiocese moved pursuant to Fed. R. Civ. P. 52(d), 59(a)(2), and 59(e) for amended or additional findings and conclusions of law and to amend the judgment, arguing that the district court had erred in denying its CUIPA claim. The district court denied the post-trial motion on July 26, 2017, and entered the amended judgment. Cross appeals ensued.

"On appeal from a judgment after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo. Mixed questions of law and fact are also reviewed de novo." Roberts v. Royal Atl. Corp., 542 F.3d 363, 367 (2d Cir. 2008).

Three issues are presented under Connecticut law:

> 1) Whether the Archdiocese's right to indemnity on the claims at issue withstands the assault and battery exclusion.
>
> 2) Whether the loss was an occurrence, that is, neither intended nor expected.
>
> 3) Whether Interstate's improper denial of claims amounted to a general business practice under CUIPA, Conn. Gen. Stat. § 38a-816(6).

## II

Interstate argues that, because the priests who committed the molestation are assureds under the contract along with the Archdiocese, coverage is rendered unavailable to the Archdiocese by the assault and battery exclusion (the "Exclusion") in the underlying Lloyds contract, which states:

> This coverage does not apply:
>
> (a) To liability of any Assured for assault and battery committed by or at the direction of such Assured except liability for Personal Injury or Death resulting from any act alleged to be assault and battery for the purpose of preventing injury to persons or damage to property.

Supp. App'x at 1901. The term "Assured" includes the Archdiocese and, among others, "any official, trustee or employee of [the Archdiocese] while acting within the scope of his duties as such . . . ." App'x at 70 ¶ 9 (alteration in original).

Construction of an insurance policy is a question of law for the Court. Flint v. Universal Mach. Co., 238 Conn. 637, 642 (1996). "Under Connecticut law,

the rules of contract construction govern the interpretation of an insurance policy." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990). "When the terms of an insurance policy are clear and unambiguous, they must be accorded their ordinary meaning," id., and "[t]he determinative question is the intent of the parties, that is, what coverage the . . . [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy," Heyman Assocs. No. 1 v. Ins. Co. of State of Pa., 231 Conn. 756, 770 (1995) (second alteration in original). "Where recovery under a policy turns on the interpretation of an exclusionary clause, the insurer bears the burden of demonstrating that the loss is excluded under the express terms of the policy." W. World Ins. Co., 922 F.2d at 121.

Interstate contends that the Exclusion evidences intent to bar recovery as to *all* assureds if any one of them commits the assault or battery, arguing that the phrase "such assured" refers back to the phrase "any assured" and thus encompasses them all. Since the priests are among the assureds, Interstate's position is that recovery is excluded as to the Archdiocese as well.

In response, the Archdiocese observes that the Exclusion applies only to a person "acting within the scope of his duties," and that the assailant priests were not acting within the scope of their duties when they committed assault. Supp. App'x at 1921. Further, the wording excludes coverage only to those assureds who committed or directed the assault rather than to all assureds. The Archdiocese also invokes the familiar principle that ambiguities in a standard-form insurance contract are construed against the insurer.

We agree with the Archdiocese on the reading of the contract and therefore need not consider ambiguity.

First, for the purposes of this litigation, it is doubtful whether the assailant priests were "assureds" under the contract. Interstate's reservation of rights letter for one of the four claims (that of JA) took the position that the priest "was acting outside the course and scope of his priestly duties . . . when he allegedly sexually abused [JA and] . . . therefore, would not qualify as an insured under [Interstate]'s policy . . . ." Supp. App'x at 1936. Interstate took the same position in the Fifth Circuit. See Interstate Fire & Cas. Co. v. Catholic Diocese of El Paso,

5

622 F. App'x 418, 420 (5th Cir. 2015).  Interstate should be bound to its own reading of its contract.

Second, even if the assailant priests are "assureds," the Exclusion bars coverage only for an assailant, not for all Assureds.  To begin, an insurer has the burden of proving that an exclusion to coverage applies, and exclusions are construed against the insurer.  See Nationwide Mut. Ins. Co. v. Pasiak, 327 Conn. 225, 239 (2017).  The rest is grammar.

The Connecticut Supreme Court has recognized that the dictionary definition of "such" includes "having a quality already or just specified." LaProvidenza v. State Emp. Ret. Comm'n, 178 Conn. 23, 27 (1979) (internal quotation marks omitted); see also id. ("The word 'such' has been construed as an adjective referring back to and identifying something previously spoken of; the word naturally, by grammatical usage, refers to the last antecedent.").  So, we read "such" as a term of limitation that references what has been previously specified; so read, the word operates here to limit the Exclusion to "such Assured" as committed or directed the assault and battery.

Under a contrary reading, blameless insureds would lose coverage by the act of someone else, and their coverage would be rendered illusory.  Although there could of course have been such an exclusion, it would have had to be more explicit than this one.  And that would have been easy.  Repeating the word "any" in place of "such" would have done it.  Or the Exclusion could have excluded claims for assault and battery, without more.  To read the Exclusion as only relating back to "any assured" would obviate the limiting phrase referencing one who commits or directs the misconduct--a superfluity that would be contrary to Connecticut law.  See Buell Indus., Inc. v. Greater N.Y. Mut. Ins. Co., 259 Conn. 527, 539 (2002) ("[E]ach and every sentence, clause, and word of a contract of insurance should be given operative effect.  Since it must be assumed that each word contained in an insurance policy is intended to serve a purpose, every term will be given effect if that can be done by any reasonable construction." (internal quotation marks omitted)). "If the terms of the policy are clear, their meaning cannot be forced or strained by an unwarranted construction to give them a meaning which the parties obviously never intended."  Marcolini v. Allstate Ins. Co., 160 Conn. 280, 283 (1971).

6

Interstate relies on <u>Interstate Fire & Casualty Co. v. Roman Catholic Church of Phoenix</u>, 761 F.3d 953 (9th Cir. 2014), which held (over a dissent) that the (same) assault and battery exclusion bars coverage for both the assured who committed or directed the assault and battery as well as for all other assureds, including the Phoenix Archdiocese. The Ninth Circuit read the phrases "any Assured" and "such Assured" as signifying the same thing: "when an exclusionary clause precludes recovery to 'any insured,' the term is not ambiguous and clearly encompasses all persons insured under the policy." <u>Id.</u> at 955 (internal quotation marks omitted). That argument was also raised by Lloyds--and rejected--in <u>Diocese of Winona v. Interstate Fire & Cas. Co.</u>, 858 F. Supp. 1407, 1415 (D. Minn. 1994), <u>rev'd in part on other grounds</u>, 89 F.3d 1386 (8th Cir. 1996).

Judge Nelson's dissent in the <u>Phoenix</u> case is sound. He reasoned that, because the quality of having committed or directed the assault and battery is the attribute that immediately precedes "such Assured," the best interpretation was that "such Assured" refers back to this quality. <u>Id.</u> at 956-57 (Nelson, J., dissenting). Under that reading, the exclusion applies only to those assureds who commit or direct the wrong. <u>Id.</u> at 958 (Nelson, J., dissenting).

Interstate cites some opinions in this Circuit and the Connecticut state courts that interpreted the phrase "any insured" in an exclusion as unambiguously foreclosing coverage for all insureds. <u>See</u>, <u>e.g.</u>, <u>McWeeny v. City of Hartford</u>, 287 Conn. 56, 67 (2008) (the term "such individual" plainly refers back to "any individual"). However, the policies in those cases use distinctly different language than the one at issue here. In any event, the question is not whether "such Assured" does or can reference "any Assured"; the question is whether the reference back includes the wording of limitation that narrows "any Assured" to one that committed or directed an assault or battery.

7

## III

Interstate is bound to indemnify the Archdiocese "for all sums" it was obligated to pay "arising out of any occurrence or happening during the period of insurance." App'x at 1083. "Occurrence" is defined as: "An accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property during the policy period." Id. Interstate contends: that there is no coverage if the accident or happening is intended or expected, regardless of whether the resulting loss was intended or expected; that intention and expectation is an objective test rather than a subjective question viewed from the standpoint of the insured; and that in any event the extraordinary circumstances present here would justify or require an objective test.

Given the contract terms and the coverage positions taken by Interstate, we must consider when the abuse to the four underlying claimants occurred, when the Archdiocese became aware that the assailants were a threat to children, and what the Archdiocese did in response.

> 1) JA alleged that he was sexually abused by Father Robert Ladamus when JA was a student at St. Mary's Church and School in 1981 or 1982. It is uncontested on appeal that the Archdiocese was not on notice that Fr. Ladamus was a risk before he assaulted JA, and that the assault was an occurrence.
>
> 2) KS alleged that he was sexually abused by Father Stephen Crowley when KS was approximately eight years old and a student at St. Francis of Assisi School in the 1981-1982 school year. The district court found evidence that Fr. Crowley began assaulting children as early as 1975, but concluded that the Archdiocese was not on notice of Fr. Crowley's abuse until March 1983, when a group of parents wrote to Archbishop John Whealon of Hartford, after the abuse of KS. It is uncontested on appeal that the Archdiocese was not on notice that Fr. Crowley was a risk at the time he molested KS, and that this was an occurrence.

3) Richard Mallory alleged that he was sexually abused by Father Ivan Ferguson, a teacher at Northwest Catholic High School who was in residence at the rectory at St. Bernard's Church between November 1977 and October 1978. The district court found as a matter of law, and it is uncontested on appeal, that the Archdiocese was not on notice of Fr. Ferguson's abuse until March 1979, after the abuse of Mallory. This too was an occurrence.

4) Matthew Doe alleged that he was sexually abused by Fr. Ferguson from the summer of 1981 to the fall of 1982, when Doe was 13-14 years old and when Fr. Ferguson was the Assistant Pastor at St. Mary's Parish.

The indemnity issues bearing on the occurence clause therefore concern only the claim made by Matthew Doe because he is the only claimant as to whom the Archdiocese had prior notice of the assailant priest's proclivities before the abuse occurred. The issues are whether the molestation was an occurrence under the insurance contracts, and whether it was intended or expected. These issues all bear upon the overarching "element of 'fortuity' necessary for an accident," Capstone Bldg. Corp. v. Am. Motorists Ins. Co., 308 Conn. 760, 775 (2013), and require a narrative concerning Fr. Ferguson, and what the Archdiocese knew and did about him.

Mallory's mother reported Fr. Ferguson's abuse of her son to Fr. Shea, pastor of St. Bernard's, in the fall of 1978; and the mother of KC (another victim, not at issue here) told Fr. Donahue, co-pastor of St. Mary's, of sexual abuse by Fr. Ferguson in 1978. KC also alleged that Fr. Shea had witnessed him with Fr. Ferguson on multiple occasions, though not in compromising circumstances. Further, the mother of BTL (yet another victim) spoke to Fr. Donahue about Fr. Ferguson in early 1979.

However, the district court found that Fathers Shea and Donahue were insufficiently senior to allow the imputing of their knowledge to the Archdiocese. The court determined that the Archdiocese was first on notice when on March 7, 1979, Fr. Ferguson called Archbishop Whealon's secretary, Fr. Gianelli, to say that he had molested two boys and had an alcohol problem.

9

The Archdiocese therefore learned of Fr. Ferguson's proclivities prior to his abuse of Doe. After Archbishop Whealon had notice of Fr. Ferguson's abuse, Archbishop Whealon told Fr. Gianelli to send Ferguson to the House of Affirmation, a rehabilitation center for sexual dysfunction. But when the House of Affirmation could not accommodate Fr. Ferguson, it was suggested that Fr. Ferguson be sent instead to St. Luke Institute, which is an alcohol treatment center rather than a rehabilitation facility for pedophiles--though priests accused of similar misconduct were regularly sent there. Father Gianelli consulted with the Medical Director of St. Luke, Fr. Doctor Michael Peterson, who recommended that Fr. Ferguson should be placed in a treatment program that would fix his substance abuse problems first. Father Doctor Peterson, who was a psychiatrist and Assistant Professor at Georgetown University Medical School, opined that Fr. Ferguson's pedophilia was triggered by his alcoholism. The Archbishop relied on Fr. Dr. Peterson's assessment.

When Fr. Ferguson's inpatient treatment ended in July 1979, Archbishop Whealon reassigned Fr. Ferguson to Laurelton Hall, a school for girls, to serve as chaplain while residing in the rectory of St. Mary's Parish. The priests, principal, and supervisors at the school were advised that Fr. Ferguson had been treated for alcohol abuse; the child molestation was not disclosed.

On June 24, 1980, Fr. Dr. Peterson and an alcoholism counselor at St. Luke Institute wrote to Fr. Kennedy, vicar for priests, to express support for Fr. Ferguson's return to work in a high school environment; Archbishop Whealon was copied on the letter. Father Doctor Peterson again wrote to Archbishop Whealon in June 1981 (memorializing a conversation he had had with the Archbishop a month before), reaffirming his full support for Fr. Ferguson's reassignment to "a more exciting teaching assignment"; "it [wa]s his professional opinion that the other issues that brought Father Ferguson to us for treatment will be in control as long as the disease of alcoholism is in control." App'x at 1091 (alteration in original). Fr. Ferguson was then assigned as a full-time Assistant Pastor at St. Mary's. It was there that Fr. Ferguson molested Matthew Doe.

The district court determined that Archbishop Whealon reasonably relied on Fr. Dr. Peterson's assessment that Fr. Ferguson would not return to sexual

10

abuse of minors so long as he remained sober, and that the Archdiocese therefore lacked notice that Fr. Ferguson would molest Doe.

To revisit the essential contract terms: Interstate is required to indemnify the Archdiocese for loss "arising out of any occurrence or happening during the period of insurance." App'x at 1083. "Occurrence" is defined as: "An accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property during the policy period." App'x at 1083. Construing those terms, the district court determined that:

> Interstate was obligated to indemnify the Archdiocese for all sums paid (a) arising out of the Archdiocese's placement of the accused priests in environments where they had the opportunity to abuse children *if* (b) the Archdiocese did not *subjectively know* that it was (c) *substantially probable* that the priests would abuse children.

App'x at 1083 (emphasis in original).

Interstate raises three arguments on appeal.

**1.** Interstate argues that, under the definition of "occurrence," the "accident or a happening" itself must be unexpected and unintended, even if the resulting injury comes as a surprise. Interstate relies on <u>Pennsylvania General Insurance Company v. Thakur</u>, No. 3:12-CV-1799-AWT, 2014 WL 3906456 (D. Conn. Aug. 11, 2014), which observed that "[t]he relevant inquiry here at the stage of determining whether there was an 'occurrence' is whether the event causing the injury was an accident, not whether the injury itself is accidental." <u>Id.</u> at *3. From there, Interstate surveys the failures of the Archdiocese to take effective action: KC had told Fr. Donahue of Fr. Ferguson's abuse back in 1978, and Archbishop Whealon knew of the misconduct in March 1979, yet sent him to a rehabilitation facility for alcohol abuse, not pedophilia. Placing Fr. Ferguson in St. Mary's where he had the opportunity to molest Matthew Doe was therefore (according to Interstate) a reckless act that was no accident.

Interstate's argument is not frivolous. In <u>Jacob Doe v. Hartford Roman Catholic Diocesan Corporation</u>, 317 Conn. 357, 394 (2015), the tort liability case

11

involving Fr. Ferguson's abuse of Matthew Doe's best friend, the Connecticut Supreme Court determined that the Archdiocese was reckless. And the Eighth Circuit, in <u>Diocese of Winona v. Interstate Fire & Casualty Company</u>, 89 F.3d 1386 (8th Cir. 1996), concluded in similar circumstances that there was no occurrence.

However, we agree with the district court that the proper inquiry is whether the injuries were expected, not whether the accidents were expected. It would seem that in most instances the concepts merge and cannot be teased apart. But insofar as it matters, Interstate loses the point. The contracts in the cases on which Interstate relies, such as <u>Thakur</u>, 2014 WL 3906456, define an occurrence simply as "an accident," whereas the occurrence clause at issue here defines an occurrence as an accident (or "happening," "event," and "continuous and repeated exposure to conditions") that "unexpectedly or unintentionally *results* in personal injury." App'x at 985 (emphasis added). So the focus is on intention and expectation as to the resulting injury rather than the accident itself. To find otherwise would require discounting the clause after "accidents," which (as explained above) we cannot do. See <u>Buell Indus., Inc. v. Greater N.Y. Mut. Ins. Co.</u>, 259 Conn. 527, 539 (2002).

**2.** More consequential in this case is whether intention and expectation is determined by an objective test of what a reasonable person knew or should have known (as Interstate argues), or whether it is determined subjectively from the standpoint of the insured (as the district court concluded).

Interstate relies on the Eighth Circuit ruling in <u>Diocese of Winona</u>, 89 F.3d 1386, that the test is objective, and invokes the ruling in <u>Jacob Doe</u> that the Archdiocese was reckless. Since recklessness is a state of mind that entails conscious choice, Interstate contends that the Archdiocese is collaterally estopped from claiming that Matthew Doe's claim is an occurrence.

The district court properly determined that intention and expectation is considered from the standpoint of the insured. Connecticut state trial courts apply a subjective standard. <u>See, e.g.</u>, <u>Colony Ins. Co. v. Walnut Beach, LLC</u>, No. CV-094011366, 2010 WL 1224364, at *4 (Conn. Super. Ct. Feb. 25, 2010) ("[I]t is well established that in gauging intention and expectation, the analysis must be

12

conducted from the standpoint of the insured."); <u>Steadfast Ins. Co. v. Purdue Federick Co.</u>, No. X08-CV-020191697S, 2006 WL 1149185, at *3 (Conn. Super. Ct. Apr. 11, 2006) ("[W]here the expected and intended language does not indicate otherwise, the majority rule that a court should apply a subjective standard as to whether the insured expected or intended the damage is 'fair.'"); <u>Linemaster Switch Corp. v. Aetna Life and Cas. Corp.</u>, No. CV91-0396432S, 1995 WL 462270, at *24 (Conn. Super. Ct. July 25, 1995) (same). Interstate cites <u>Diocese of Winona</u>, 89 F.3d 1386, which is to the contrary, but is expounding the law of Minnesota. Minnesota is an outlier, however.[2]

In cases that are distinguishable but influential nonetheless, the Connecticut Supreme Court has rejected the "should have known" standard for determining what is "expected" under a commercial general liability policy. In <u>Capstone Building Corp. v. American Motorists Insurance Co.</u>, 308 Conn. 760 (2013), the word "accident" was not defined. The court adopted the "ordinary meaning of an 'unexpected happening'", which "means 'unexpected or unintended.'" <u>Id.</u> at 774. The court added: "We have held that '[a]n accident is an event that is unintended from the perspective of the insured.'" <u>Id.</u> at 775 (quoting <u>Vt. Mut. Ins. Co. v. Walukiewicz</u>, 290 Conn. 582, 594 (2009)).

Since the recklessness standard differs from the subjective standard, <u>see</u> <u>Allstate Ins. Co. v. Berube</u>, 84 Conn. App. 464, 470-71 (2004) (a shooting was an "occurrence" because, regardless of the insured's reckless conduct, he did not specifically intend the resulting injury); <u>Harleysville Worcester Ins. Co. v. Paramount Concrete Inc.</u>, 10 F. Supp. 3d 252, 264-65 (D. Conn. 2014) (holding that

---

[2] <u>See</u> <u>e.g.</u>, <u>City of Johnstown, N.Y. v. Bankers Standard Ins. Co.</u>, 877 F.2d 1146, 1150 (2d Cir. 1989) (interpreting New York law); <u>Broderick Inv. Co. v. Hartford Accident & Indem. Co.</u>, 954 F.2d 601, 606 (10th Cir. 1992), <u>cert. denied</u>, 506 U.S. 865 (1992) (interpreting Colorado law); <u>Smith v. Hughes Aircraft Co.</u>, 783 F. Supp. 1222, 1236 (D. Ariz. 1991); <u>Hatco Corp. v. W.R. Grace & Co.–Conn.</u>, 801 F. Supp. 1334 (D. N.J. 1992); <u>Brown Foundation v. St. Paul Ins. Co.</u>, 814 S.W.2d 273, 278-79 (Ky. 1991); <u>Am. Home Assurance Co. v. Safway Steel Prods. Co.</u>, 743 S.W.2d 693, 701 (Tex. Ct. App. 1987); <u>Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.</u>, 126 Wash.2d 50, 68 (1994); <u>Farmers & Mechanics Mut. Ins. Co. v. Cook</u>, 210 W. Va. 394, 400 (2001).

a jury's finding that the policyholder was reckless would not bar coverage under the policy's "expected and intended" clause), collateral estoppel cannot be applied to Matthew Doe's claims based on the Connecticut Supreme Court findings in Jacob Doe, see Crochiere v. Bd. of Educ., 227 Conn. 333, 345 (1993) ("Before collateral estoppel applies there must be an identity of issues between the prior and subsequent proceedings. To invoke collateral estoppel the issues sought to be litigated in the new proceeding must be identical to those considered in the prior proceeding.").

**3.** Finally, Interstate argues that even if the inquiry on intention and expectation is ordinarily subjective, this Court should follow the reasoning in Linemaster Switch Corp. v. Aetna Life & Casualty Corp., No. CV91-0396432S, 1995 WL 462270, at *1 (Conn. Super. Ct. July 25, 1995), which held that in "exceptional circumstances" the subjective test for an occurrence should be changed to an objective one.

There is no need here to extend Linemaster Switch. Linemaster Switch was an environmental tort case, and Interstate identifies no other Connecticut case which relies on the "exceptional circumstances" exception.

We do not question the conclusion in Jacob Doe, 317 Conn. 357, that the Archdiocese was reckless in allowing Fr. Ferguson to reenter a school for boys. Nevertheless, a subjective standard applies to the Matthew Doe claim, the only claim in this case in which the Archdiocese had prior notice of the assailant priest's proclivities. Under that standard, the Archdiocese did not intend or expect the injury, given that Archbishop Whealon relied on Fr. Dr. Peterson--a psychiatrist who ran a treatment center--who opined that treatment of Fr. Ferguson's alcoholism would allow him to work safely in a school for boys. The Archbishop monitored the situation, receiving regular reports on Fr. Ferguson's status from Fr. Dr. Peterson (and from Fr. Ferguson himself). Thus Archbishop Whealon, and the Archdiocese, did not subjectively know that Fr. Ferguson would abuse more children.

14

## IV

As the district court concluded, the Archdiocese failed to support its claims under CUIPA. CUIPA does not provide litigants an independent cause of action, so Connecticut plaintiffs are allowed to use CUTPA as a vehicle to bring CUIPA claims. CUTPA prohibits any person from "engag[ing] in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Conn. Gen. Stat. § 42-110b(a), and provides a right of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment" of an unfair or deceptive act, id. § 42-110g(a). CUIPA in turn defines unfair or deceptive acts or practices in the insurance business, and prohibits any person from engaging in such practices in Connecticut. See id. § 38a-815.

Among the prohibited practices under CUIPA are "unfair claim settlement practices," including, as relevant here: "failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies," id. § 38a-816(6)(B); "failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed," id. § 38a-816(6)(E); "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," id. § 38a-816(6)(F); and "compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds," id. § 38a-816(6)(G).

To prove an "unfair claim settlement practice," a plaintiff must demonstrate that the defendant has engaged in unfair or deceptive acts "with such frequency as to indicate a general business practice." Id. § 38a-816(6).

The district court found that Interstate "fail[ed] to affirm or deny the [four] underlying claims within a reasonable time after Plaintiff's provision of a proof of loss." App'x at 1152. For JA's claim, Interstate had all of the documentation it requested, knew the amount of the settlement and that it pierced Interstate's layer, and knew the amount of reimbursement sought by the Archdiocese, one year and nine months before this suit was filed. For the claims of Mallory, KS,

15

and Doe, Interstate had this information (respectively) five months, seven months, and nine months before this suit was filed. The delays were unusual. But it is fair to say that clergy molestation claims justify close inquiry and investigation as to the insured's knowledge (or lack) of the circumstances bearing on intention and expectation, and that such claims entail coverage questions that are not insubstantial. However, the parties litigated the CUIPA claim chiefly on the basis of what constitutes a "general business practice" under § 38a-816(6)(E) of CUIPA, and the district court decided it on that basis. We will review that ruling.

The claims history is similar as to all four of the claims that are the subject of this appeal. When each of the four victims filed lawsuits against the Archdiocese, the Archdiocese gave notice to Interstate and the other insurers. Interstate does not contest the finding that the Archdiocese fulfilled its notice obligation. After getting notice, Interstate requested documentation, and reserved rights. The reservation of rights letter asserted the positions (inter alia) that, if the allegations were proven, the priest whose acts gave rise to the claim had been acting outside the course and scope of priestly duties and therefore would not qualify as an assured, and that, since the intentional assault of a minor did not constitute an occurrence, coverage would be voided if it was shown that the Archdiocese was on notice of the priest's proclivities. Interstate opened a claim file and communications were exchanged. After Interstate was notified of the settlement and the Archdiocese requested indemnity, many months of delay ensued notwithstanding repeated notices from the Archdiocese and its counsel.

The Archdiocese submitted 57 claims as a representative sample of Interstate's response to sexual abuse claims across the country. The district court found that 9-11 percent of the 57 claims reflected misconduct, a total of nine cases (five in other settlements, and the four at issue here). However, relying on the definition of "general business practice" in Lees v. Middlesex Insurance Co., 229 Conn. 842 (1994), the district court concluded that misconduct in handling that percentage of claims did not evidence a "general business practice" that would violate CUIPA.

The Archdiocese argues that the district court erred as a matter of law in considering what constitutes a "general business practice" because: (1) the

16

quantum of proof to establish a general business practice is lower than 9-11 percent; (2) a Handbook issued by the National Association of Insurance Commissioners ("NAIC") confirms that 9-11 percent is sufficient; and (3) in any event Interstate admitted that it *never* provided policyholders with a categorical denial of coverage in priest-misconduct claims.

**1.**  Relying on the Connecticut Supreme Court's dictionary-based definition of "general business practice" in <u>Lees</u>, 229 Conn. 842, the district court concluded that misconduct in 9-11 percent of claims did not constitute a general business practice.  We agree with the district court that the Archdiocese fails to demonstrate a violation of CUIPA.  While a single instance of misconduct is insufficient to demonstrate a "general business" practice under CUIPA, <u>see Mead v. Burns</u>, 199 Conn. 651, 659 (1986), no Connecticut appellate court has said how many acts of misconduct would suffice, nor is "general business practice" defined in Connecticut General Statute § 38a-816(6).  Acknowledging this, the Connecticut Supreme Court in <u>Lees</u>, 229 Conn. 842, advised that a court "may look to the common understanding of the words as expressed in a dictionary." <u>Id.</u> at 849 n.8.  Doing so, the Connecticut Supreme Court observed that "'[g]eneral' is defined as 'prevalent, usual [or] widespread'; Webster's Third New International Dictionary**;** and 'practice' means '[p]erformance or application habitually engaged in . . . [or] repeated or customary action.'"  <u>Id.</u>

Under this definition, Interstate's misconduct in nine cases in a limited sample of 57 claims--out of more than 1700 sexual abuse settlements nationwide--does not evidence a "prevalent, usual [or] widespread" practice.  <u>Id.</u>

The Archdiocese relies on cases in which an appreciable percent of misconduct was detected in a small sample: for example, four cases of misconduct out of eight claims in <u>Tucker v. American International Group</u>, 179 F. Supp. 3d 224, 244 (D. Conn. 2016).  That is a different situation from this one, where there is a large sample size.

**2.** The Market Regulation Handbook produced by NAIC presumes that there is a general business practice if more than seven percent of sampled claims are found to entail a particular kind of misconduct.  The Archdiocese contends that the Handbook is authoritative because: NAIC helped draft the Model Act on

17

which CUIPA is based; NAIC has an ongoing role in advising state insurance departments on enforcement; the Connecticut Supreme Court looked to NAIC reports to help define "insurer" in Doucette v. Pomes, 247 Conn. 442, 461 (1999); and the Connecticut legislature recently passed legislation allowing the Insurance Department to rely on NAIC standards in its investigations.

The district court properly rejected the argument premised on the NAIC Handbook, which describes itself as a regulatory creation "designed primarily as a guideline for regulatory agencies to use in developing their own procedures for performing market conduct examinations. It does not reflect policies or procedures that are required to be implemented by any jurisdiction." NAIC Mkt. Regulation Handbook, Vol. 1, Chapter 8, F. Disclaimers, p. 114. Presumably that is why the Archdiocese is unable to point to a Connecticut case that relied on the NAIC seven percent error rate to support a finding of civil liability under CUIPA.

**3.** Finally, the Archdiocese contends that Interstate admitted that it *never* provided policyholders with a categorical affirmance or denial of coverage in priest-misconduct claims, and cites a Massachusetts opinion on a motion to dismiss, which ruled that even a single incident of misconduct could demonstrate a general business practice if the insurer, by word or action, conceded that the single incident reflected its overall practice. See RAMS II, LLC v. Mass. Bay Ins. Co., No. CV136043177S, 2016 WL 3266084, at *3 n.1 (Conn. Super. Ct. May 23, 2016).

Interstate did not concede at trial (as the Archdiocese asserts) that Interstate "never affirmed or denied a claim" of priest sexual abuse. The argument misrepresents the testimony of Interstate's witness, Debra Sons. She testified that while she had never written a denial letter on the basis of the occurrence provision, she had issued denial letters based on other coverage issues, and that where it was clear that there had been an "occurrence" under the policy, Interstate would negotiate with the insured, or file a declaratory judgment action to resolve the coverage issue.

What the Archdiocese is really arguing is that the Connecticut legislature, when drafting subsection E of CUIPA, intended that insurance companies must

formally accept or deny coverage even if other steps are being taken to resolve a disputed claim. As the district court observed: just because claims remained pending does not mean that Interstate failed to affirm or deny coverage within the meaning of subsection E, especially since the Archdiocese admits that "Interstate has not received enough information to make [a] determination" as to some of the claims. App'x at 1699.

\* \* \*

For the foregoing reasons, the judgments of the district court are **AFFIRMED**.