UNITED STATES DISTRICT COURT 
 DISTRICT OF CONNECTICUT 

MURPHY MEDICAL ASSOCIATES, LLC ET AL., 

 Plai ntiffs 
 Civil No.3:20cv1675 (JBA) 
 v. , 

 C I G DNeAfe HnEdaAnLtTsH AND LIFE INS. CO. ET AL. 
 May 12, 2023 
 . 
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS’ PARTIAL MOTION 
 TO DISMISS 
I. Background 
 See 
 The Court assumes familiarity with the factual background of the case. ( Order 
Granting in Part Defs.’ Mot. to Dismiss [Doc. # 48].) The procedural history is as follows. 
Plaintiffs brought this action alleging violations of the Families First Coronavirus Response 
Act (“FFCRA”) and Coronavirus Aid, Relief and Economic Security Act (“CARES Act”), the 
Employee Retirement Income Security Act of 1974 (“ERISA”), the Connecticut Unfair Trade 
Practices Act (“CUTPA”), as well as unjust enrichment, quantum meruit and tortious 
interference claims related to both ERISA and non-ERISA plans. (Am. Compl. [Doc. # 29]). 
 Previously, Defendants moved to dismiss all claims with prejudice. (Defs.’ Mot. to 
Dismiss. Am. Compl. [Doc # 30] at 1.) Relevant here, they argued that PlaintiffsI’d C. UTPA 
(Count Five) and unjust enrichment (Count Six) claims were preempted by ERISA. ( at 26-
29.) Plaintiffs’ opposition broadly argued that ERISA preemption did not apply to the state 
law claims as a whole, stating that distinguishing between ERISA and non-ERISA plans was 
“irrelevant.” (Pls.’ Opp’n [Doc. # 31] at 31-35.) The Court partially granted the motion to 
dismiss, including dismissing Counts Five and Six with prejudice on ERISA preemption 
 Plaintiffs moved under Rule 59(e) for reconsideration of the Court’s dismissal and for 
leave to file a Second Amended Complaint (Pls.’ Mem. [Doc. # 50-1] at 1) which was granted. 
(Order Granting Mot. to Reconsider [Doc. # 71].) Following a pre-filing conference, Plaintiffs 
filed the operative Third Amended Complaint (TAC. [Doc. # 92]) which Defendants now 
move to dismiss with prejudice as to Counts Two (CUTPA) and Three (Unjust Enrichment), 
on the grounds that they fail to state a viable claim upon which relief can be granted. (Defs.’ 
Partial Mot. to Dismiss [Doc. # 93].) At oral argument Plaintiffs withdrew Count Three, and 
sIIo. onlyL Ceoguanl tS Ttawnod iasr adt issue. 

 The Court has previously set out the standards for deciding a motion to dismiss 
pIIuI.r suanDti stocu Rsuslieo n12 (b)(6). (Order Granting in Part Defs.’ Mot. to Dismiss [Doc. # 48] at 3-4.) 

 Under CUTPA, Conn. Gen. Stat. § 42-110b(a), “[n]o person shall engage in unfair 
methods of competition and unfair or deceptive acts or practices in the conduct of any trade 
or commerce.” To assist courts in determining whether a practice violates CUTPA, the 
Connecticut Supreme Court has identified several relevant factors, only one of which needs 
to be satisfied: 
 (1) whether the practice, without necessarily having been previously 
 considered unlawful, offends public policy as it has been established by 
 statutes, the common law, or otherwise . . . ; (2) whether it is immoral, 
 unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial 
Harris vin. jBurrayd tloey c oMnesmum’l Heross.p . & Health Ctr., Inc 

 ., 296 Conn. 315, 350-51 (2010). “A practice 
may violate CUTPA without meeting all three criteria—i.e. a practice may be unfair because 
of the dLeagurerae Ltoa awmhaicnh A its smoce.,e LtsL Co nve. Dofa vthise criteria or because to a lesser extent it meets all 
three.” , No. 3:16-cv-00594 (MPS), 2017 WL 5711393, at 
*9 (D. Conn. Nov. 27, 2017). 
 see 
Keller vD. Beefecnkednasnttesi nargue that “[a] claim under CUTPA mucesrt tb. dee pnlieedd with particularity,” 
Ferrari v. U.S. Equiti,e 1s 1C7o rCpo.nn. App. 550, 569 n.7 (2009), , 294 Conn. 913 (2009); 
 , No. 3:13-cv-00395, 2014 WL 5144736 at *3 (D. Conn. Oct. 14, 
2014) (same), which Plaintiffs rebut with Connecticut Supreme Court precedent that there 
is no “special requiremeMnta ocof mplbeeard vin. gT rpaavretliecrusl aPrriotyp .c &o nCnaesc. Cteodr pw.ith a CUTPA claim, over and 
above any other claim.” , 261 Conn. 620, 644 (2002). 
 Plaintiffs assert a number of claims arising under CUTPA based on the Connecticut 
Unfair Insurance Practices Act (“CUIPA”), as well as claims based on alleged violations of 
other statutes. Plaintiffs maintain this Count applies to non-ERISA plans and thus is not 
preempAt.e d. (TCAUCI, P¶A 1/2C7U).T PA Claims 

 Plaintiffs allege that Cigna engaged in unfair claims settlement practices and failed to 
 1 
timely pay insurance claims in violation of CUIPA, Conn. Gen. Stat. §§ 38a-816S(e6e) Pe, totne nwghililc vh. 
tFhiree CmUaTnP’sA F uclnadims I niss .b, Caose.d. (TAC, ¶¶ 122-167) (the “CUIPA/CUTPA” claims.) 
Nazami v. Patrons Mut. I, nNso. .C 3o:.13cv154 (WWE), 2013 WL 405T4ra6y3l5or ( Dv.. ACwonwna. Aug. 12, 2013); 
 , 280 Conn. 619, 625 (2006); , 88 F. Supp. 3d 
102, 108 (D. Conn. 2015). However, “if a plaintiff brings a claim pursuant to CUIPA alleging 
an unfair insurance practice, and the plaintiff further claims that the CUIPA violation 
Scotantset ivt.u Atecodr ad iCaU, ITnPcA violation, the failure of the CUIPA claim is fatal to the CUTPA claim.” 
 1. ., 3H1a0v Ceo nPnla. 1in, t3i1ff(s2 0A1l3le).g ed Cigna’s Actions Constitute a General 
 Business Practice? 

1 
 The Amended Complaint does allege a violation of one CUIPA provision outside of Section 
 As a threshold matter, to prevail on a CUIPA claim under Section 816(6), a plaintiff 
must present “enough facts to permit [] the reasonable inference that the unfair insurance 
pKrimac vti.c Set aotcec Fuarrremd F wiriet h& eCnaosu. Cgoh. frequency for it to be deemed a general business practice.” 
 see alsoLees v. M,i dNdol.e 3se:1x5 I-ncsv. -C0o0.879(VLB), 2015 WL 667553 2N, aatti o*5n w(Did. eC Monunt.. 
OFicrte. 3In0s,. 2C0o1. 5v.) ;H ermann , 229 Conn. 842, 850 (1994); 
 , No. CV126009631S, 2014 WL 4817899, at *4 (Conn. Super. Ct. Aug. 
25, 2014) (collecting cases). 
 “The alleged mishandling of vLa.rAio. Luism eoleumsineen tIsn co.f v t.h Lei bsearmtye Mcluati.m In ds.o Ceos .not reach the 
level of a general business practice.” Starview Ventures v. Acadia Ins., , 509 F. Supp. 
2d 176, 182 (D. Conn. 2007) (citing No. cv-065003463S, 
2006 WL 3069664 at *3 (Conn. Super. Ct. Oct. 17, 2006). Allegations sufficient to establish a 
general business practice are “[t]ypically” accomplishedC o“nbnye ccittiicnugt t Mo outnh. eErl ecca.s Eense brrgoyu Cgohotp [.b vy. 
oNtahte'lr U innsiounre Fdisr]e aIngas.i nCsot. tohf eP ditetsfebnudrgahn,t PoAr ,i tNso a. f3fi:l1ia9t-ecsv.-”8 39 (JCH), 2020 WL 6888272, at *3 (D. 
Conn. Jan. 17, 2020) Mazzarella v. Amica Mut. Ins. Co 
 (citing ., 774 F. App’x 14, 18 (2d Cir. 
2019)). 
 Factors relevant to a court’s determination of whether a practice is a ‘general 
 business practice’ include: the degree of similarity between the alleged unfair 
 practices in other instances and the practice allegedly harming the plaintiff; 
 the degree of similarity between the insurance policy held by the plaintiff and 
 the policies held by other alleged victims of the defendant’s practices; the 
 degree of similarity between claims made under the plaintiff’s policy and those 
 made by other alleged victims under their respective policies; and the degree 
 to which the defendant is related to other entities engaging in similar 
 pHraarcttfiocreds .R oman Cath. Diocesan Corp. v. Interstate Fire & Cas. Co

 aff’d ., 199 F. Supp. 3d 559, 
602–03 (D. Conn. 2016), , 905 F.3d 84 (2d Cir. 2018). While “general business practice” 
is not precisely defined in Connecticut law, “the Connecticut Supreme Court has advised that 
a court ‘may look to the common understanding of the words as expressed in a dictionary.’. 
usual [or] widespread’; and ‘practice’ means ‘[Hp]aerrtffoorrmd Ranomcea no rC aathp.p Dliicoacteiosann hCaobrpit.ually 
engaged in . . . [or] repeLaeteesd vo. rM ciudsdtloemseaxr Iyn as.c Ctioo.n.’” , 905 
F.3d 84 at 96 (quoting , 229 Conn. 842 at 849). 
 Defendants argue that Plaintiffs fail to allege facts demonstrating that Cigna has 
engaged in the same allegedly improper activity with other providers. Plaintiffs do not 
respond to this argument except to argue that to demonstrate a general business practice, a 
plaintiff “must demonstrate that the proscribed conduct occurred with sufficient frequency 
to indicate a general business practice as opposed to an isolated, improper handling of a 
single insurance claim.” (Pls.’ Opp’n at 15.) claims 
 This issue comes down to whether sheer frequency of denial of Plaintiffs’ is 
sufficpireonvti deevren without allegatioHna trhtfaotr tdh eR opmraacnt icCea tgho. eDs iboeceysoannd denial of claims from just 
one , the Plaintiffs. In , the Second Circuit found 
insufficient evidence of a general business practice even where plaintiffs “submitted 57 
claims as a representative sample of [defendant’s] response to [diocesan] sexual abuse 
claims across the country,” where “9-11 percent of the 57 claims reflected misconduct.” 905 
F.3d at 96. The Second Circuit noted that there were “more than 1700 sexual abuse 
settlements nationwide” and so defendant’s conduct in thIdis. limited sample of 57 claims was 
insufficient to demonstrate a general business practice. Here, Plaintiffs fail to allege that 
Defendant s have violated CUIPA in their processHinagr tofof rdclaims submitted by any other 
providers.This Court’s Memorandum of Decision in looked taon fda tchtoorsse imncaldued binyg o “tthheer 
dalelgegreeed ovfi cstimimisla urnitdye bre tthweeire nre cslpaeimctsiv me apdoeli cuinedser the plaintiff’s policy 
 Hartford Roman Cath. Dioce”s iann determining whether there was a general 
business practice. , 199 F. Supp. 3d at 602 (emphasis added). 
This factor presumes the existence of “other alleged victims” when evaluating whether a 
general business practice exists. Because Plaintiffs fail to plausibly plead the existence of 
other alleged victims of Cigna’s insurance practices, Plaintiffs’ CUTPA claims based in CUIPA 
must beB d. ismiCssaend .P laintiffs Plead a Standalone CUTPA Cause of Action Not Specifically 
 Proscribed by CUIPA? 

 Defendants claim that Plaintiffs may not proceed on their non-CUIPA based CUTPA 
claims, which are based only on violations of the CARES Act, the FFCRA, and the Connecticut 
 2 
Surprise Billing Law. (Defs.’ Mem. at 11.) Plaintiffs argue this is permitted because they are 
aNlEleMgiSn Pg LaL Cv ivo. lHataiorvna ordf aP i“lgsrtaimtu tHee areltghu Claatrine go fa C sopnenceicfitcic tuytp Ien co.f insurance related conduct,” 
 see , 615 F. Supp. 3d 125, 138 (D. 
Conn. 2022); ( Pls.’ Opp’n at 7). 
 The Connecticut Supreme Court has held that “[b]ecause CUIPA provides the 
exclusive and comprehensive source of public policy with respeocrt, taor ggueanbelrya, ls oinmseu roatnhceer 
pstraatcuttiec erse g. u. l.a utinnlge sas sapne cinifsicu rtyapnec eo fr einlastuerda npcrea crteilcaet evdi ocloantedsu cCtUIPA 
 , it cannotS tbaet efo vu. nAdco trod ivai,o Ilnatce. 
any public policy, and, therefore, it cannot be foNuEnMd Sto violate CUTPA.” , 
310 Conn. 1, 37 (2013) (emphasis added). In , District Judge Nagala concluded that 
some standalone CUTPA claims outside of CUIPA could be maintained “where there is an 
alleged violation of a statute regulating a specific type of insurance related conduct.” 615 F. 
 3 
Supp. 3d at 138. Some Connecticut state courts have come to a contrary conclusion. 

2 
 Plaintiffs also reference in paragraph 96 of Stehee TAC that Cigna “made defamatory and 
malicious statements about the Murphy Practice and Dr. Murphy to its patients and others,” 
which they incorporate into the CUTPA count. TAC ¶ 139 (“Cigna’s actions, including its 
refusal to comply with the FFCRA, the CARES Act and Connecticut Law, as well as those 
actions described above at paragraphs 83 through 90, and 92 through 99, constitute unfair 
claims settlement practices in violation of the Connecticut Unfair Insurance Practices Act, 
CoSneen . Gen. Stat. § 38a-816.”). CPolnanin. tPifrfas c.n, eUvnefra ierx Tprlaaidne hPorwac tsiucecsh defamatory conduct is 
p3 roscribed by CUTPA. 
 12 Robert Lsaeneg aelrs oe Ct hailc.,a go Title Insurance Company v. LaPum §a 3:13 (collecting cases 
 NEMS Artie's Auto Body, Inc. v. Hartford Fire Ins. Co. 
 found guidance in , 317 Conn. 602 
(2015), where the Connecticut Supreme Court held that “‘although § 38a-790-8 reasonably 
may be characterized as regulating insurance related conduct insofar as it prescribes a 
standard of conduct for appraisers who estimate the cost to insurers of auto body 
repairs,’ that provision did not regulate the conduct at issue because the labor rate an auto 
body shop would be paid was the subject of negotiation between the insurer andN EthMeS shop, 
and did not run afoul of the Aertthieicsal duties of appraiseNrsE sMeSt forth in the statute.” , 615 
F. Supp. 3d at 138 (quoting , 317 Conn. at 6A2r5ti.e) 's concluded that the “implication 
of the Connecticut Supreme Court's language in is that, had the statute regulated the 
conduct at issuAe,c othrdei aConnecticut Supreme Court would have allowed the CUTPA claim to 
proceed under ’s holding that a statute regulating a specific type of insurance related 
cIdo.n duct could give rise to a CUTPA claim, even if the conducNt EdMoeSs not also violate CUIPA.” 
 While a close isAscuoer,d tihae Court agrees with the analysis in because the Connecticut 
Supreme Court in expressly left open the possibility that CUTPA could provide relief 
based on tAhceo vridoialation of “some other statute regulating a specific type of insurance related 
conduct.” , 310 Conn. at 37. As such, Plaintiffs may bring certain standalone CUTPA 
claims based on alleged violations of statutes regulating a specific type of insurance related 
conduct. 1. Standalone CUTPA Claims Asserted 
 a) The CARES Act and FFCRA 

 To address the impact of the COVID-19 pandemic, Congress passed the FFCRA and 
the CARES Act, requiring health insurance issuers to cover the costs of SARS-CoV-2 

 Acordia 

*5 (Conn. Super. Ct. Aug. 23, 20e1x6p)l ic(iintltyerpreting the phrase “some other statute 
regulating a specific type of insurance related conduct” as providing the basis for a CUTPA 
diagnostic tests at no cost to a patient and thus regulate insurance-related conduct. The 
FFCRA states that: 
 SEC . 6001. COVERAGE OF TESTING FOR COVID–19. 
 (a)IN GENERAL. —A group health plan and a health insurance issuer offering 
 group or individual health insurance coverage . . . shall provide coverage, 
 and shall not impose any cost sharing (including deductibles, copayments, 
 and coinsurance) requirements or prior authorization or other medical 
 management requirements, for the following items and services furnished 
 during any portion of the emergency period . . . beginning on or after the 
 date of the enactment of this Act: 

 (1) In vitro diagnostic products . . . for the detection of SARS–CoV–2 or the 
 diagnosis of the virus that causes COVID–19 that are approved, cleared, or 
 authorized . . . and the administration of such in vitro diagnostic products. . . . 

 (b) ENFORCEMENT.—The provisions of subsection (a) shall be applied by the 
 Secretary of Health and Human Services, Secretary of Labor, and Secretary of 
 the Treasury to group health plans and health insurance issuers offering group 
 or individual health insurance coverage as if included in the provisions of part 
 A of title XXVII of the Public Health Service Act, part 7 of the Employee 
 Retirement Income Security Act of 1974, and subchapter B of chapter 100 of 
 the Internal Revenue Code of 1986, as applicable. 

 (c) IMPLEMENTATION.—The Secretary of Health and Human Services, 
 Secretary of Labor, and Secretary of the Treasury may implement the 
 provisions of this section through sub-regulatory guidance, program 
 instruction or otherwise. 

The CARES Act provides: 
 SEC. 3201. COVERAGE OF DIAGNOSTIC TESTING FOR COVID-19 
 Paragraph (1) of section 6001(a) of division F of the Families First Coronavirus 
 Response Act (Public Law 116–127) is amended to read as follows: 

 ‘‘(1) An in vitro diagnostic test defined in section 809.3 of title 21, Code of 
 Federal Regulations (or successor regulations) for the detection of SARS–CoV–
 2 or the diagnosis of the virus that causes COVID–19, and the administration 
 of such a test, that— 

 ‘‘(A) is approved, cleared, or authorized under section 510(k), 513, 515, or 564 
 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360(k), 360c, 360e, 
 360bbb–3); 
‘‘(B) the developer has requested, or intends to request, emergency use 
authorization under section 564 of the Federal Food, Drug, and Cosmetic Act 
(21 U.S.C. 360bbb– 3), unless and until the emergency use authorization 
request under such section 564 has been denied or the developer of such test 
does not submit a request under such section within a reasonable timeframe; 

‘‘(C) is developed in and authorized by a State that has notified the Secretary 
of Health and Human Services of its intention to review tests intended to 
diagnose COVID–19; or 

‘‘(D) other test that the Secretary determines appropriate in guidance.’’. 

SEC. 3202. PRICING OF DIAGNOSTIC TESTING. 
(a) REIMBURSEMENT RATES.—A group health plan or a health insurance 
issuer providing coverage of items and services described in section 6001(a) 
of division F of the Families First Coronavirus Response Act (Public Law 116–
127) with respect to an enrollee shall reimburse the provider of the diagnostic 
testing as follows: 

(1) If the health plan or issuer has a negotiated rate with such provider in effect 
before the public health emergency declared under section 319 of the Public 
Health Service Act (42 U.S.C. 247d), such negotiated rate shall apply 
throughout the period of such declaration. 

(2) If the health plan or issuer does not have a negotiated rate with such 
provider, such pla,n or issuer shall reimburse the provider in an amount that 
equals the cash price for such service as listed by the provider on a public 
internet website or such plan or issuer may negotiate a rate with such 
provider for less than such cash price. 

(b) REQUIREMENT TO PUBLICIZE CASH PRICE FOR DIAGNOSTIC TESTING 
FOR COVID–19.— 

(1) IN GENERAL.—During the emergency period declared under section 319 
of the Public Health Service Act (42 U.S.C. 247d), each provider of a diagnostic 
test for COVID–19 shall make public the cash price for such test on a public 
internet website of such provider. 

(2) CIVIL MONETARY PENALTIES.—The Secretary of Health and Human 
Services may impose a civil monetary penalty on any provider of a diagnostic 
test for COVID–19 that is not in compliance with paragraph (1) and has not 
completed a corrective action plan to comply with the requirements of such 
paragraph, in an amount not to exceed $300 per day that the violation is 
 Defendants argue that Plaintiffs’ CUTPA-based claims under the CARES Act and 
FFCRA are defective because the Amended Complaint fails to allege Murphy posted a cash 
price for its diagnostic testing. (Defs.’ Mem. at 3.) While Section 3202(b) of the CARES Act 
specifically contemplates certain penalties for failure to post a cash price, it does not relieve 
an insurer’s obligations, and dismissal is not warranted on this basis. 
 specDifeicfetnydpaents also argue that the FFCRA and CARES Act cannot be said to be regulating 
a “ of insurance related conduct” (emphasis added) because both statutes 
address a large variety of policy issues. (Defs.’ Reply [Doc. # 104] at 8.) But Cigna provides 
no support for the notion that a statute is not regulating a “specific type” of insurance-related 
conduct merely because it regulates other conduct as well. Here, the statutes regulate the 
specific conduct at issue in this case: reimbursement for Covid-19 testing services. As such, 
Plaintiffs have sufficiently pled a CUTPA cause of actions based on Cigna’s alleged violations 
of the CARES Act and bF)F CRAC. onnecticut Surprise Billing Law 
 NEMS 
 Plaintiffs also bring a CUTPA claim under Connecticut’s Surprise Billing Law. 
concluded that ConnectiScueet’ sN ESMurSprise Billing Law provided a permissible basis for a 
standalone CUTPA claim. , 615 F. Supp. 3d at 142. Cigna argues that Plaintiffs have 
failed to allege facts supporting their allegation that Cigna was required to reimburse claims 
under the Connecticut Surprise Billing Law because, as Plaintiffs acknowledge, the law does 
not apply to asymptomatic patients, and Plaintiffs fail to delineate which Cigna members 
claimed to be experiencing symptoms when they sought testing. (Defs.’ Opp’n at 15.) 
Moreover, Defendants dispute that being symptomatic before taking a Covid test constitutes 
the sort of “emergency condition” to which the Surprise Billing Law applies. (Defs.’ Opp’n at 
15.) 
 The Surprise Billing Law applies to patients with an “emergency condition,” Conn. 
 4 
medical condition’, as provided in section 38a-591a.” Defendants argue that an emergency 
condition is one whose symptoms warrant going to an emergency department, and that “[i]t 
is simply not plausible to conclude that a person who was experiencing an emergency 
medical condition would visit a drive-up Covid testing site rather than go to a hospital 
emergency department. (Defs. Memo at 16.) Defendants point to the definition of Emergency 
Services under the statute that states “a medical screening examination as required under 
Section 1867 of the Social Security Act, as amended from time to time, that is within the 
capability of a hospital emergency department, including ancillary services routinely 
available to such department to evaluate such condition, and such further medical 
examinations and treatment required under said Section 1867 to stabilize such individual 
that are within the capability of the hospital staff and facilities.” C.G.S. § 38a-477aa(a)(2). 
 Given the initially unknown characteristics of a Covid-19 infection which rapidly 
transformed non-acute symptoms into potential life-threatening Covid-19 emergencies, this 
determination requires factual determinations about what symptoms existed for patients in 
question, and what symptoms constituted medical emergencies. At this motion to dismiss 
stage, where the Court must construe all well-pled allegations in favor of the Plaintiffs, 
Plaintiffs have sufficiently pled their claim that the Connecticut Surprise Billing Law was 
vIVio. latedC.o nclusion 
 For the foregoing reasons, Defendants’ Partial Motion to Dismiss Counts Two and 
Three of Plaintiffs’ Third Amended Complaint [Doc. # 93] is GRANTED in Part and Denied in 

4 
Conn. Gen. Stat. § 38a-591a(14) defines “emergency medical condition” as “a medical 
condition manifesting itself by acute symptoms of sufficient severity, including severe pain, 
such that a prudent layperson with an average knowledge of health and medicine, acting 
reasonably, would have believed that the absence of immediate medical attention would 
result in serious impairment to bodily functions or serious dysfunction of a bodily organ or 
Part. Count Two, insofar as it alleges CUTPA claims under the CARES Act, the FFCRA, and the 
Connecticut Surprise Billing Law, shall proceed. All remaining claims alleged under Counts 
Two and Three are DISMISSED. 

 IT IS SO ORDERED. 
 /s/ 
 Janet Bond Arterton, U.S.D.J. 
 Dated at New Haven, Connecticut this 12th day of May, 
 2023