UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
August Term, 2022
(Submitted: March 28, 2023     Decided: September 20, 2023)
Docket No. 22-0047-cv

───────────────

SIEMENS ENERGY, INC.,
*Plaintiff-Appellee,*

v.

PETRÓLEOS DE VENEZUELA, S.A.,
*Defendant-Appellant,*

PDVSA PETRÓLEO, S.A.,
*Defendant,*

RED TREE INVESTMENTS, LLC,
*Intervenor.*[*]

───────────────

Before:     SACK, LOHIER, AND CARNEY, *Circuit Judges.*

In January 2017, Defendant-Appellant Petróleos de Venezuela, S.A. ("PDVSA"), an oil company wholly owned by the Bolivarian Republic of Venezuela, entered into a Note Agreement with then-Plaintiff-Appellee Dresser-Rand Company.[†]  PDVSA made two of the twelve payments due under the Note Agreement in April and July 2017 but failed to make any subsequent payments. In February 2019, Dresser-Rand declared PDVSA to be in default, accelerated the debt, and initiated this action in Supreme Court, New York County, which

---

[*]  The Clerk of Court is respectfully directed to amend the caption as set forth above.

[†] While this appeal was pending, Dresser-Rand Co. agreed to merge with Siemens Energy, Inc. ("Siemens").  Dkt. No. 77 at 1.  In anticipation of the merger, Dresser-Rand assigned the judgment at issue in this appeal to Siemens and filed a motion for Siemens to be substituted as Plaintiff-Appellee pursuant to Federal Rule of Appellate Procedure 43(b), *id.*, which we granted, Dkt. No. 80.  For purposes of this opinion, we refer to Dresser-Rand when recounting the factual and legal history of the case but note that, today, Siemens is the real party in interest.

Defendants removed to the United States District Court for the Southern District of New York.

PDVSA claims that any further payment was impossible and should therefore be excused. But in December 2021, following a three-day bench trial, the district court (Stanton, *J.*) concluded that PDVSA had failed to prove that repayment was impossible. It therefore entered judgment in favor of Dresser-Rand and imposed post-judgment interest accruing at a rate of 8.5% per annum.

On appeal, PDVSA contends that the district court erred in concluding that payment was not impossible. PDVSA further asserts that the district court incorrectly calculated post-judgment interest. However, we agree with the district court that payment by PDVSA was not impossible, and because we further conclude that PDVSA forfeited any arguments relating to post-judgment interest, we

AFFIRM the judgment of the district court.

> Jessica A.B. Livingston, Hogan Lovells US LLP, Denver, CO; Dennis H. Tracey, III, Matthew Ducharme, Hogan Lovells US LLP, New York, NY, *for Defendant-Appellant*;
>
> Kim M. Watterson, Devin Misour, Reed Smith LLP, Pittsburgh, PA; Jordan W. Siev, Reed Smith LLP, New York, NY, *for Plaintiff-Appellee*.

SACK, *Circuit Judge*:

In January 2017, Defendant-Appellant Petróleos de Venezuela, S.A.

("PDVSA"), an oil company wholly owned by the Bolivarian Republic of

Venezuela, entered into a Note Agreement with then-Plaintiff-Appellee Dresser-

Rand Company[1] for a principal amount, as stated in an accompanying Note, of

approximately $120 million. PDVSA made two of the twelve payments due

under the Note in April and July 2017 but failed to make any subsequent

payments. In February 2019, Dresser-Rand declared PDVSA to be in default,

accelerated the debt, and initiated this action in Supreme Court, New York

County, which Defendants removed to the United States District Court for the

Southern District of New York.

PDVSA asserted that its failure to pay should be excused under New York

law because performance became "impossible." But in December 2021,

following a three-day bench trial, the district court (Stanton, *J.*) concluded that

PDVSA had failed to prove that payment was impossible and therefore entered

---

[1] While this appeal was pending, Dresser-Rand Co. agreed to merge with Siemens Energy, Inc. ("Siemens"). Dkt. No. 77 at 1. In anticipation of the merger, Dresser-Rand assigned the judgment at issue in this appeal to Siemens and filed a motion for Siemens to be substituted as a party pursuant to Federal Rule of Appellate Procedure 43(b), *id.*, which we granted, Dkt. No. 80. For purposes of this opinion, we refer to Dresser-Rand when recounting the factual and legal history of the case but note that, today, Siemens is the real party in interest.

judgment in favor of Dresser-Rand, including post-judgment interest accruing at a rate of 8.5% per annum as prescribed by the agreement between the parties.

On appeal, PDVSA contends that the district court erred in holding that payment was not impossible. PDVSA also argues that the district court incorrectly calculated post-judgment interest. Because we conclude that the district court was correct in holding that payment was not impossible and that PDVSA has forfeited any arguments regarding post-judgment interest, we affirm the judgment of the district court.

## BACKGROUND

### I. The Note Agreement

On January 20, 2017, PDVSA entered into a Note Agreement (the "Note Agreement" or "Agreement") with Dresser-Rand Company, for which Dresser-Rand served as Initial Noteholder and Administrative Agent; PDVSA served as Issuer; and PDVSA Petróleo, S.A. ("Petróleo"), served as Guarantor. The principal sum of the Note issued pursuant to the Note Agreement (the "Note") was approximately $120 million, and interest on the unpaid principal balance accrued at a prescribed rate of 6.5% per annum. Under the terms of the Note Agreement, PDVSA agreed to make twelve quarterly payments to Dresser-Rand:

2

The first four, to be paid between 2017 and 2018, would count toward only interest, while the final eight, to be paid between 2018 and 2020, would be divided between interest and principal. *See* App'x at 1074 (Sections 2.02 and 2.03 of the Note Agreement, establishing rules for repayment of and interest on the Note); *id.* at 1111 (Exhibit A, repayment schedule); *id.* at 1136–37 (Note). Under the terms of the Note Agreement, payment could be made in U.S. Dollars either to Dresser-Rand's offices in Texas or to Dresser-Rand's designated bank account with Citibank, N.A. ("Citibank").

In the event of overdue payment on either the principal or the interest, the Note Agreement specified that interest would accrue on both the overdue principal and interest at a default rate of 8.5% per annum. Further, the Note contained an acceleration clause, which stated that, "[i]f an Event of Default . . . occurs and is continuing, the principal of this Note, together with all accrued and unpaid interest hereon, may be declared or otherwise become due and payable in the manner, and with the effect provided in the Note Agreement." App'x at 1137. Finally, Section 9.08 of the Note Agreement stated that the Agreement could not be amended "except pursuant to an agreement . . . in writing entered into by the Issuer and the Required Noteholders." *Id.* at 1101.

3

PDVSA made two quarterly interest payments of approximately $1.9 million each in April and July 2017. But "[f]ollowing the second quarterly interest payment on July 20, 2017, [Dresser-Rand] did not receive another payment from PDVSA as required under the Note and Note Agreement." App'x at 557 (Agreed Findings of Fact).

PDVSA asserts that further payment was impossible because of a sanctions program imposed against Venezuela and PDVSA by the President of the United States and because of banks' consequent hesitancy to do business with PDVSA. On August 24, 2017, the Trump Administration issued Executive Order ("E.O.") 13808, which prohibited transactions of "new debt" between United States persons or entities and PDVSA.[2] Imposing Additional Sanctions With Respect to the Situation in Venezuela, Exec. Order No. 13808, 82 Fed. Reg. 41,155, 41,155 (Aug. 24, 2017). The E.O. prohibited, in relevant part, "[a]ll transactions related to, provision of financing for, and other dealings in . . . new debt with a maturity of greater than 90 days of [PDVSA]" "by a United States person or within the

---

[2] E.O. 13808 was issued by the President pursuant to the executive powers vested in him under Article II of the Constitution; the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* (IEEPA); the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*; and 3 U.S.C. § 301. *See* Imposing Additional Sanctions With Respect to the Situation in Venezuela, Exec. Order No. 13808, 82 Fed. Reg. 41,155, 41,155 (Aug. 24, 2017).

United States." *Id.*

The E.O. did not define "new debt." However, a "Frequently Asked Questions" ("FAQs") document issued by the U.S. Office of Foreign Assets Control ("OFAC") states that, for purposes of E.O. 13808, "OFAC considers 'new debt' to be debt created on or after August 25, 2017."[3] App'x at 1479 ("FAQ 553"). It added that:

> OFAC does not consider debt that was created prior to August 25, 2017 to be "new debt" for purposes of E.O. 13808 so long as the terms of the debt instrument (including, for example, the length of the repayment period or any interest rate applied) agreed to by the parties do not change on or after August 25, 2017. Such preexisting debt does not need to conform to the 30- or 90-day tenors imposed under E.O. 13808, and U.S. persons may collect and accept payment for such debt regardless of whether the relevant segment of the Government of Venezuela, including [PDVSA], pays during the agreed-upon payment period.

*Id.* The parties agree that, at the time the Trump Administration issued E.O. 13808, PDVSA's debt to Dresser-Rand was preexisting debt that could lawfully

---

[3] The President, in E.O. 13808, authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including promulgating rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order." Imposing Additional Sanctions With Respect to the Situation in Venezuela, 82 Fed. Reg. at 41,156. And under 31 C.F.R. § 591.802, "[a]ny action that the Secretary of the Treasury is authorized to take pursuant to . . . Executive Order 13808 of August 24, 2017 . . . may be taken by the Director of OFAC or by any other person to whom the Secretary of the Treasury has delegated authority so to act." Delegation of certain authorities of the Secretary of the Treasury, 31 C.F.R. § 591.802 (2023).

be repaid under the terms of the Order.  *See* Appellant's Br. at 22; Appellee's Br.

at 24**.**

In response to E.O. 13808, banks adopted internal risk-management

policies that were designed to ensure that any transactions that the banks

conducted conformed with OFAC requirements.  And while E.O. 13808 provided

a regulatory floor, banks could—and did—enact stricter policies that "combined

the threshold regulatory requirements with the banks' unique risk tolerance

factors."  *Dresser-Rand Co. v. Petróleos de Venezuela, S.A.*, 574 F. Supp. 3d 217, 220

(S.D.N.Y. 2021).[4]  Typically, if a bank was asked to process a payment to or from

PDVSA as the originator, intermediate, or recipient (i.e., beneficiary) bank,[5] that

---

[4] Cases involving PDVSA have occasionally used slight variations in formatting the company's name. For consistency and convenience, this opinion uses "Petróleos de Venezuela, S.A." in all citations to these cases.

[5] We have previously explained the mechanics of an electronic fund transfer ("EFT") as follows:

> An EFT is nothing other than an instruction to transfer funds from one account to another. When the originator and the beneficiary each have accounts in the same bank that bank simply debits the originator's account and credits the beneficiary's account. When the originator and beneficiary have accounts in different banks, the method for transferring funds depends on whether the banks are members of the same wire transfer consortium. If the banks are in the same consortium, the originator's bank debits the originator's account and sends instructions directly to the beneficiary's bank upon which the beneficiary's bank credits the beneficiary's account. If the banks are not in the same consortium—as is often true in international transactions—then the banks must use an intermediary bank. To use an intermediary bank to complete the transfer, the banks must each have an

6

bank would flag the payment and analyze whether it violated E.O. 13808 or that

bank's internal risk measures.  If the payment was deemed acceptable under

both policies, payment could proceed; if it failed under both, it would be

rejected.  But "[a]s some banks are more risk adverse [sic] than others, some

policies were more restrictive than E.O. 13808."  *Dresser-Rand Co.*, 574 F. Supp. 3d

at 220.  Thus, in some circumstances, a bank could refuse to process a payment

on risk-management grounds even if the transaction would not violate federal

sanctions.

Finally, on November 1, 2018, President Trump issued E.O. 13850, which

blocked any United States person or entity from transferring, paying, or

otherwise dealing in the "property and interests in property" of "blocked"

persons.  Blocking Property of Additional Persons Contributing to the Situation

in Venezuela, Exec. Order No. 13850, 83 Fed. Reg. 55,243, 55,243 (Nov. 1, 2018).

On January 28, 2019, OFAC designated PDVSA as a blocked person pursuant to

---

account at the intermediary bank (or at different banks in the same consortium). After the originator directs its bank to commence an EFT, the originator's bank would instruct the intermediary to begin the transfer of funds. The intermediary bank would then debit the account of the bank where the originator has an account and credit the account of the bank where the beneficiary has an account. The originator's bank and the beneficiary's bank would then adjust the accounts of their respective clients.

*Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 60 n.1 (2d Cir. 2009).

E.O. 13850.[6] But that same day, OFAC also issued General License 9, which

authorized transactions "that are ordinarily incident and necessary to dealings in

any debt" of PDVSA that had been "issued prior to August 25, 2017."

Publication of Venezuela Sanctions Regulations Web General License 9 and

Subsequent Iterations, 87 Fed. Reg. 62,020, 62,021 (Oct. 13, 2022) (referencing Off.

of Foreign Assets Control, General License No. 9: Authorizing Transactions

Related to Dealings in Certain Securities (Jan. 28, 2019)).[7]

## II.     Attempts at Payment and Default

On October 20, 2017, PDVSA failed to timely pay its third scheduled

quarterly interest payment.[8] About a month later, on November 21, 2017,

PDVSA attempted to wire the third quarterly interest payment from its China

CITIC Bank ("China CITIC") account to Dresser-Rand's Citibank account by way

of an intermediary, Deutsche Bank. While China CITIC successfully sent the

---

[6] Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A. (Jan. 28, 2019), https://perma.cc/T3AE-PMAU.

[7] General License 9 has expired and been superseded by General License 9G, which remains in effect today. *See* Publication of Venezuela Sanctions Regulations Web General License 9 and Subsequent Iterations, 87 Fed. Reg. 62,020, 62,020 (Oct. 13, 2022); Off. of Foreign Assets Control, General License No. 9G: Authorizing Transactions Related to Dealings in Certain Securities (May 12, 2020), https://perma.cc/7P4F-2QL9.

[8] PDVSA has offered no evidence that it attempted to pay the third quarterly interest payment on or before that date.

outbound payment, Deutsche Bank, the intermediary, rejected the transfer based

on its internal risk policies and returned the funds.

On November 29, 2017, PDVSA wrote to Dresser-Rand to acknowledge its

difficulty completing the quarterly payment due, in part, to the "imposition of

economic sanctions against PDVSA by the government of the United State[s] of

America" and "request[ed] a waiver of 30 additional days . . . in order to remedy

the delay in the aforesaid payment of interest."  App'x at 1221.  Dresser-Rand, in

response, "agreed to accept the already past due third quarterly interest payment

after the agreed-upon payment period, on or before December 29, 2017."  App'x

at 558.[9]

On December 18, 2017, PDVSA asked that Dresser-Rand provide an

alternate bank account to which payment could be made because, according to

PDVSA's Treasury Management, "Citibank rejects payments from PDVSA."

App'x at 1236–37.  In response, on December 27, 2017, Dresser-Rand provided

---

[9] It is undisputed that, in November 2017, Dresser-Rand agreed to accept the third quarterly interest payment on or before December 29, 2017.  App'x at 558 (Agreed Findings of Fact); *id*. at 1282 (email from Dresser-Rand noting that "the additional period requested by PDVSA [for the third quarterly interest payment] ends on <u>December 29, 2017</u>"); Appellant's Br. at 11–12; Appellee's Br. at 8, 12–13.  It is not clear from the available record, however, precisely when and in what manner Dresser-Rand first communicated to PDVSA its consent to accept the third quarterly interest payment on or before December 29, 2017.  For purposes of this opinion, when discussing Dresser-Rand's affirmative response to PDVSA's request, we quote from and cite to the parties' agreed factual finding.

PDVSA the details for a Commerzbank AG account that was held by Siemens

AG, Dresser-Rand's parent company, to which payment could be made in U.S.

Dollars. There is no evidence in the record reflecting any attempt by PDVSA to

make a payment to this account, despite encouragement from Dresser-Rand.

On January 31, 2018, PDVSA directed Dinosaur Merchants Bank Limited

("DMBL"), another bank at which it had an account, to transfer the overdue

payment to Dresser-Rand's Citibank account. While PDVSA provided Dresser-

Rand with proof of this initiated transfer, the payment was never transmitted to

Citibank. On February 12, 2018, PDVSA again initiated payment from DMBL to

Citibank, this time via J.P. Morgan Chase Bank ("J.P. Morgan") as an

intermediary. While the funds were successfully transmitted from DMBL to J.P.

Morgan, Citibank rejected the payment from J.P. Morgan in accordance with its

own internal risk-management policies.

On February 20, 2018, PDVSA requested that Dresser-Rand open a bank

account at Novobank so that it could submit the payment in Euros instead of

U.S. Dollars. PDVSA, at the time, had an existing banking relationship with

Novobank. Dresser-Rand agreed and took steps to facilitate the transaction by,

among other things, confirming that Novobank could accept payments from

PDVSA without restriction, drafting an amendment to the Note Agreement to allow for payment in Euros, and requesting a meeting with PDVSA for further discussion. However, we have been directed to no evidence in the record, nor have we found any ourselves, indicating that PDVSA responded to Dresser-Rand's outreach on the topic, which spanned from March to April 2018. Despite PDVSA's lack of response, by October 2018, Dresser-Rand had opened an account with Novobank.

On February 14, 2019, Dresser-Rand sent PDVSA a formal notice of default. In the letter, Dresser-Rand requested that PDVSA remedy its default within five days. After PDVSA failed to do so, Dresser-Rand issued a notice of acceleration on February 21, 2019, in which it declared the balance of the Note—including all principal and applicable interest—immediately due and payable.

## III.  Current Litigation

On February 26, 2019, Dresser-Rand initiated this action by motion for summary judgment in lieu of complaint in Supreme Court, New York County, pursuant to CPLR 3213. The defendants, PDVSA and Petróleo, timely removed the case to the United States District Court for the Southern District of New York. The district court (Stanton, *J.*) construed Dresser-Rand's motion as a motion for

summary judgment pursuant to Federal Rule of Civil Procedure 56.  In February

2020, the district court granted summary judgment in favor of Dresser-Rand as to

Petróleo based on Petróleo's waiver of all defenses except for complete payment,

a decision that this Court affirmed.  *Dresser-Rand Co. v. Petróleos de Venezuela,*

*S.A.*, 439 F. Supp. 3d 270, 274 (S.D.N.Y. 2020), *aff'd sub nom. Dresser-Rand Co. v.*

*Pdvsa Petróleo, S.A.*, No. 20-1990, 2021 WL 2878936, at *1 (2d Cir. July 9, 2021)

(summary order).  However, the district court denied summary judgment as to

PDVSA on the ground that issues of material fact existed regarding PDVSA's

impossibility defense.  *Id.* at 274–75.

In September 2021, the district court held a three-day bench trial to resolve

the issue of impossibility.  In December 2021, pursuant to Rule 52 of the Federal

Rules of Civil Procedure, the district court issued findings of fact and conclusions

of law, in which it decided that timely payment was not impossible.  First, it held

that OFAC sanctions did not prohibit PDVSA's payments because the Note

Agreement was not "new debt" within the meaning of E.O. 13808.  Second, the

district court concluded that, although PDVSA unsuccessfully attempted

payment three times, these failed efforts were insufficient to prove that payment

was impossible.  Accordingly, the district court entered judgment in favor of

12

Dresser-Rand in the amount of $166,082,240.21, plus post-judgment interest to accrue at the rate of 8.5% per annum. PDVSA now appeals that judgment.

## DISCUSSION

PDVSA advances three principal arguments on appeal. First, it asserts that Dresser-Rand's agreement in November 2017 to accept delayed payment constituted a change to the terms of the Note such that the debt became "new," repayment of which is prohibited under E.O. 13808. Second, PDVSA contends that the district court clearly erred in finding that banks' internal risk policies did not prevent PDVSA from making payments under the Note. And third, PDVSA argues that the district court incorrectly calculated post-judgment interest.

For the reasons set forth below, we reject PDVSA's first and second arguments on the merits and conclude that it has forfeited the third.

### I.       Standard of Review

"Following a bench trial, we review a district court's findings of fact for clear error . . . ." *Republic of Turkey v. Christie's Inc.*, 62 F.4th 64, 69–70 (2d Cir. 2023); *see also* Fed. R. Civ. P. 52(a)(6). The clear error standard requires that we accept a district court's factual findings unless "we are 'left with the definite and firm conviction that a mistake has been committed.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 119 (2d Cir. 2021) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364,

395 (1948)).  Clear error might occur, for example, if the district court points to no evidence whatsoever to substantiate a finding of fact or if the finding is contradicted by incontrovertible evidence.  *Wu Lin v. Lynch*, 813 F.3d 122, 127 (2d Cir. 2016).  But "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," we "may not reverse it."  *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74 (1985).  Conclusions of law and mixed questions of law and fact, on the other hand, are reviewed *de novo*.  *Hartford Roman Cath. Diocesan Corp. v. Interstate Fire & Cas. Co.*, 905 F.3d 84, 88 (2d Cir. 2018).

Impossibility (also known as "impracticability") is an affirmative defense under New York law against liability for nonperformance of a contractual obligation.  *See Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 22 (2d Cir. 2018); *Knickerbocker Retail LLC v. Bruckner Forever Young Social Adult Day Care Inc.*, 167 N.Y.S.3d 462, 464 (N.Y. App. Div. 2022).[10]  Under New York law, "[i]mpossibility excuses a party's performance only when the destruction of the

---

[10] Per the choice-of-law provision contained in Section 9.07 of the Note Agreement, New York law governs this dispute.  *See* App'x at 1100 ("This agreement and the other finance documents . . . , and the rights and obligations of the parties hereunder and thereunder shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of New York . . . ." (emphasis omitted and capitalization standardized)).

subject matter of the contract or the means of performance makes performance objectively impossible." *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987). "Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Id.* The defense is available to a party whose performance "is made impracticable without [the party's] fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement (Second) of Contracts § 261 (Am. L. Inst. 1981).[11] But "where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 244 N.E.2d 37, 41 (N.Y. 1968). To establish the defense of impossibility in this case, PDVSA must therefore show "that it took virtually every action within its power to perform its duties under the contract," *Health-Chem Corp. v. Baker*, 915 F.2d 805,

---

[11] When analyzing contracts governed by New York law, New York courts look to the Restatement of Contracts. *E.g.*, *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 667 (N.Y. 1998) (relying on various provisions of the Restatement (Second) of Contracts); *Trilegiant Corp. v. Orbitz, LLC*, 5 N.Y.S.3d 366, 367 (N.Y. App. Div. 2015) (citing Restatement (Second) of Contracts § 261).

810 (2d Cir. 1990), and that, despite those efforts, performance was "objectively impossible," *Kel Kim Corp.*, 519 N.E.2d at 296.

## II. PDVSA's Debt Is Not "New" Under E.O. 13808

PDVSA first asserts that repayment of the Note is prohibited under E.O. 13808 because an alleged change to the terms of the Note Agreement in November 2017 caused the debt to become "new." According to PDVSA, if the debt indeed became "new" such that E.O. 13808 prohibited its repayment, then PDVSA's performance under the Note would have been impossible, and its failure to pay would be excused under New York law. *See* Restatement (Second) of Contracts § 264 ("If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made."); *cf. Organizacion JD Ltda. v. U.S. Dep't of Just.*, 18 F.3d 91, 95 (2d Cir. 1994) (per curiam) (holding that "intervening government actions"—in that case, seizing the objects of the contract at issue— "rendered any enforceable contract impossible to perform"); *Kolodin v. Valenti*, 979 N.Y.S.2d 587, 589–90 (N.Y. App. Div. 2014) (holding that performance of a recording and management contract was "rendered objectively impossible by law" where a court order "destroyed the means of performance by precluding all

16

contact . . . except by counsel" between the parties). But the district court found that Dresser-Rand had not agreed to change either the length of the repayment period or the applicable interest rate and therefore concluded that Dresser-Rand's agreement to accept late payment did not constitute a change to the Note's terms such that E.O. 13808 would prohibit PDVSA's repayment. We review the factual findings of the district court for clear error and analyze its conclusions of law *de novo*. *Republic of Turkey*, 62 F.4th at 69–70.

E.O. 13808 prohibits transactions relating to "new debt" of PDVSA. Imposing Additional Sanctions With Respect to the Situation in Venezuela, 82 Fed. Reg. at 41,155. OFAC, in its published answer to FAQ 553,[12] clarified that "new debt" is "debt created on or after August 25, 2017." App'x at 1479. Debt created before August 25, 2017, on the other hand, is not considered "new debt" "so long as the terms of the debt instrument (including, for example, the length of the repayment period or any interest rate applied) agreed to by the parties do not change on or after August 25, 2017." *Id.* Accordingly, "U.S. persons may collect and accept payment for such [old or preexisting] debt," and this can occur "regardless of whether . . . [PDVSA] pays during the agreed-upon payment

---

[12] Both parties accept without discussion OFAC's understanding of "new debt," as articulated in FAQ 553. We see no reason to depart from OFAC's understanding here.

period." *Id.* In other words, acceptance of late payment on *old* debt is generally allowed under E.O. 13808—as PDVSA acknowledges. *See* Reply Br. at 12 ("[L]ate payments on pre-existing debt are permitted."). Acceptance of payment on *new* debt, however, is not.

The parties agree that the Note Agreement at issue in this case was signed prior to August 2017 and was therefore, at the time of E.O. 13808's issuance, preexisting debt. On November 29, 2017, though, PDVSA wrote to Dresser-Rand and "respectfully request[ed] a waiver of 30 additional days . . . to remedy the delay in the . . . payment of interest." App'x at 1221. Dresser-Rand, in response, "agreed to accept the already past due third quarterly interest payment after the agreed-upon payment period, on or before December 29, 2017." App'x at 558; *accord id.* at 1281. PDVSA contends that when Dresser-Rand agreed to accept late payment on PDVSA's third interest obligation, this constituted a change to a term of the Note Agreement because it allegedly (1) extended the due date for the third interest payment and (2) relieved PDVSA of its default on that payment, thereby allowing PDVSA to avoid default interest. We disagree.

In this case, the conduct of and correspondence between the parties did not change any term of their Note Agreement on or after August 25, 2017. On

18

the contrary, the November 2017 exchange between Dresser-Rand and PDVSA

reiterated both parties' commitments under the Note Agreement as originally

signed, and their subsequent conduct was consistent with those commitments.

Pursuant to the Note Agreement, PDVSA agreed to make regular

payments of principal and interest to Dresser-Rand according to the schedule

memorialized in Exhibit A to that Agreement. *See* App'x at 1074–75 (Note

Agreement), 1111 (Exhibit A, repayment schedule). Under Section 2.04, PDVSA

agreed that, should PDVSA fail to adhere to that schedule by "default[ing] in the

payment of any principal of or interest on any Note," then "all amounts

outstanding under this Agreement . . . shall bear interest (after as well as before

judgment), payable on demand, . . . at a rate per annum equal to eight and one-

half percent" "until such defaulted amount shall have been paid in full." *Id.* at

1074–75. Under the Note Agreement's terms, then, if PDVSA were to fall behind

on payments, it could belatedly "pa[y] in full" the "defaulted amount" to escape

default interest moving forward and resume making payments with ordinary

interest accruing. *Id.* at 1075. This framework necessarily implies that the Note

Agreement permits Dresser-Rand to *accept* such late payment. But until payment

is received, the Note Agreement specifies that outstanding amounts "shall bear interest" at the default rate. *Id.*

The November 2017 exchange between Dresser-Rand and PDVSA is consistent with this understanding of the Agreement. Dresser-Rand had not received PDVSA's third interest payment by October 20, 2017, and the payment was therefore late. Dresser-Rand confirmed that it would nevertheless "agree[] to accept the *already past due* third quarterly interest payment" through December 29, 2017. App'x 558 (emphasis added); *accord id.* at 1281.[13] The November 2017 conversation therefore did not change the date on which payment was due. Instead, the parties agreed to do what Section 2.04 of the Note Agreement expressly contemplates and allows them to do: Make and collect a late payment. The parties did not change a term of the Agreement—including the payment due date or the relevant repayment period—when they agreed to facilitate that happening. And since no term of the Agreement was changed, we agree with the district court that "new debt" was not created as contemplated by E.O. 13808.

PDVSA concedes that, in the context of this dispute, Dresser-Rand could have accepted its late interest payment absent any communication between the

---

[13] *See supra* note 9 (explaining that, for purposes of this opinion, we quote from and cite to the parties' agreed findings of fact when discussing Dresser-Rand's response to PDVSA's request).

parties without violating E.O. 13808, as "mere acceptance of a late payment does not constitute a change to a debt instrument." Reply Br. at 5. PDVSA asserts that this situation is different, however, because Dresser-Rand agreed to not only accept late payment, but also "to change the due date of the third interest payment." *Id.* at 8. In doing so, PDVSA argues, the parties' agreement moved accepting late repayment from "outside" of the parties' agreed terms to "inside" the agreed terms—in other words, the November 2017 agreement transformed the Note Agreement to become "new." But as explained above, PDVSA has not pointed to any correspondence between the parties evincing a willingness to change the *due date* of the payment or any other term of the Agreement. The correspondence, instead, indicates Dresser-Rand's willingness to accept the "already past due" payment, conduct which was and always had been acceptable under the Note Agreement as initially executed. App'x at 558. The district court did not err in so concluding.

PDVSA's arguments might have more weight if it had proved at trial that Dresser-Rand committed to relieving it of its default status when the October 2017 payment deadline was passed. But we also agree with the district court that PDVSA has identified no record evidence to support that contention.

According to the testimony of Erik Scherzer, Head of Credit Collections at

Dresser-Rand, PDVSA "w[as] already technically in default" when it failed to

make the October 2017 interest payment. App'x at 729. But, as Scherzer

explained, Dresser-Rand wanted to work with PDVSA to "find a way to a

satisfactory conclusion where payments would be made." *Id.* Dresser-Rand

therefore "didn't want to say, oh, yeah, you're in default." *Id.*

The district court interpreted Scherzer's testimony to mean that,

notwithstanding the November 2017 exchange, Dresser-Rand "considered

PDVSA to be in technical default" "as soon as PDVSA missed the October 20,

2017 payment deadline." *Dresser-Rand Co.*, 574 F. Supp. 3d at 224; *see also id.*

("No evidence in the record supports a finding that [Dresser-Rand] agreed to not

hold PDVSA in default."). As a result, the district court found that, although

Dresser-Rand agreed to accept the late payment, Dresser-Rand did not concede

that PDVSA was not in default, nor did it agree *not* to charge default interest on

the amount outstanding under the Note. We discern no clear error in the district

court's findings in this regard.

PDVSA advances a contrary interpretation of Scherzer's testimony. It

argues that, when Scherzer said that Dresser-Rand "didn't want to say [that

PDVSA was] in default," App'x at 729, he meant that Dresser-Rand considered PDVSA to not be in default and thereby disavowed imposing default interest. *See* Appellant's Br. at 25 ("The clear import of this testimony is that PDVSA was no longer in default after the November 29 [a]greement.").  Supporting PDVSA's interpretation is the fact that Scherzer agreed that PDVSA was in default "as of the . . . request for a waiver," App'x at 729, but did not express a view as to PDVSA's status following the extension request.

We find the district court's interpretation, however, to be the more reasonable.  According to Scherzer, Dresser-Rand did not tell PDVSA it was in default because such a reminder might have harmed the companies' "great relationship" and thereby reduce the likelihood of repayment.  *Id.*  But Scherzer agreed that, nonetheless, PDVSA remained "technically in default" at the time of the November 2017 exchange.  *Id.*  In fact, Scherzer confirmed that, in his view, PDVSA's request for a 30-day extension would not "change . . . the note agreement" in any way.  *Id.* at 681; *see also id.* ("It's just basically saying, hey, give us 30 days to pay.  That would be my interpretation of [the waiver request].").  As Scherzer's testimony is, at most, ambiguous, we cannot conclude that the district court's factual finding regarding its meaning was clearly erroneous.

23

PDVSA finally argues that the district court's interpretation of this evidence cannot be correct inasmuch as the Note Agreement requires Dresser-Rand to send a notice of default to PDVSA before declaring an Event of Default, and it had not yet, at the point of the November 2017 exchange, done so. PDVSA also points out that Dresser-Rand did not issue a notice of default to PDVSA until more than a year later. But these counterarguments are unavailing. The fact that Dresser-Rand had not yet sent a notice of default did not foreclose Dresser-Rand's option to do so at a later date. In fact, it makes sense that Dresser-Rand would try to collaboratively work with PDVSA to resume payments in lieu of issuing a formal notice of default as soon as the payment was late. In the event that its conciliatory approach failed, Dresser-Rand still had the option to issue the notice of default at a later date—which is exactly what it ultimately did. And the fact that Dresser-Rand did not issue that notice of default for some time does not indicate that anything prevented it from taking that action earlier.

In short, PDVSA and Dresser-Rand's November 2017 agreement merely reaffirmed Dresser-Rand's consent to accept late payment, conduct which was contemplated by and permitted under both the Note Agreement and E.O. 13808.

There was therefore no change to any term of the Note Agreement—including the third interest payment's due date, PDVSA's default status, or the applicable interest rate—at that time. The debt, as a result, did not become "new" in November 2017, and E.O. 13808 did not prohibit PDVSA's repayment of it.

### III. The District Court Did Not Clearly Err by Finding that Payment Was Not Otherwise Impossible

PDVSA's second argument is that, even if E.O. 13808 did not make repayment legally impossible, banks' internal risk-management policies made it practically impossible to complete the necessary transactions. As explained above, to succeed on this defense, PDVSA was required to prove at trial "that it took virtually every action within its power to perform its duties under the contract," *Health-Chem Corp.*, 915 F.2d at 810, and that, despite those efforts, performance was "objectively impossible," *Kel Kim Corp.*, 519 N.E.2d at 296. The district court concluded that PDVSA failed to make such a showing because, while some banks did reject PDVSA's attempts at payment, other banks were willing to—and, in fact, *did*—process the payments. Furthermore, while Dresser-Rand provided alternative accounts to which PDVSA could have attempted payment, PDVSA never made such attempts. We agree with the district court that these facts are fatal to PDVSA's impossibility defense.

25

PDVSA emphasizes that on three occasions, Citibank and Deutsche Bank refused to process its attempted third quarterly interest payment to Dresser-Rand. It also cites to testimony of its OFAC expert, John Barker, who testified that Citibank and Deutsche Bank's rejections indicated "an industry-wide reluctance to process transactions involving PDVSA." Appellant's Br. at 29 (citing App'x at 1007–08). PDVSA extrapolates from these facts that payments transmitted through any other bank would have been futile as well. But while such evidence may indicate that successfully completing payments would have been difficult, it fails to demonstrate that payment was objectively impossible.

Indeed, during the applicable time period, other banks *did* elect to process payments initiated by PDVSA. On November 21, 2017, China CITIC served as PDVSA's originating bank and successfully processed PDVSA's payment. On February 12, 2018, DMBL, also acting as PDVSA's originating bank, sent a payment to J.P. Morgan, which received and processed it, and, as intermediary, sent the payment on to Citibank.

It therefore cannot reasonably be inferred from Citibank and Deutsche Bank's rejections that *all* banks would have rejected the payments on risk-management grounds. Three other banks, on the contrary, did successfully

process such payments. It is therefore reasonable to conclude that other banks'

risk-related policies may not have prohibited PDVSA's payments and that

payment could have been successfully completed, had it been attempted.

Moreover, Dresser-Rand made available two additional bank accounts to

receive PDVSA's payment, but PDVSA failed to attempt payment to either. On

December 27, 2017, Dresser-Rand provided PDVSA the details for a

Commerzbank account that was held by Siemens AG, Dresser-Rand's parent

company, to which payment could be made in U.S. Dollars. But the parties agree

that "[t]here is no evidence that PDVSA attempted to make a payment into

Siemens AG's Commerzbank . . . account," App'x at 558, despite Dresser-Rand's

encouragement. And on February 20, 2018, PDVSA requested that Dresser-Rand

open a bank account at Novobank so that payment could be made in Euros

instead of U.S. Dollars. Dresser-Rand agreed and took steps to facilitate the

transaction by, among other things, opening a Novobank account, drafting an

amendment to the Note Agreement to allow for payment in Euros, and

requesting a meeting with PDVSA for further discussion. Novobank also

confirmed to Dresser-Rand in writing that it could accept payment from PDVSA

without restriction. But as the parties stipulated, "there is no evidence in the

27

record that PDVSA responded to [Dresser-Rand]'s outreaches, . . . and the Note Agreement was never amended." App'x at 559; *see also id.* at 863–64 (Dresser-Rand's OFAC expert witness testifying that, based on "the fact that Novobank and PDVSA already had an existing relationship, as well as [her] understanding of the banking industry and [her] knowledge about fund transfers and the application of risk policies[,] . . . it is highly unlikely that the bank would have taken a risk issue with processing this payment between" PDVSA and Dresser-Rand).

PDVSA complains that "[i]t would not [have been] reasonable for PDVSA to have subpoenaed every bank in the business in advance of trial to obtain evidence about each bank's risk-tolerance policies." Appellant's Br. at 31. But that is not what the district court suggested, nor what we suggest, was required of PDVSA. PDVSA was simply required to provide credible reasons for why payment to or through banks such as China CITIC, DMBL, J.P. Morgan, Commerzbank, and Novobank was impracticable. Having failed to do so, PDVSA has not carried its burden to show that payment was impossible.

Finally, PDVSA argues that its nonperformance should be excused because E.O. 13808 prohibited payment to any bank other than Citibank or in any

currency other than U.S. Dollars. Under this logic, changing the recipient bank or the currency of payment as initially established in the Note Agreement would have caused the debt to become "new" and therefore "violate OFAC sanctions." Appellant's Br. at 34. But we find this argument unpersuasive.

Under New York law, "[d]ifficulty or improbability of accomplishing the stipulated undertaking" is not enough to make out an affirmative defense of impossibility. *Cameron-Hawn Realty Co. v. City of Albany*, 101 N.E. 162, 163 (N.Y. 1913). Rather, "[i]t must be shown that the thing cannot *by any means* be effected," *id.* (emphasis added), and "[n]othing short of this will excuse nonperformance," *id.; see also* Restatement (Second) of Contracts § 264 cmt. a, illus. 4 (requiring that a party seeking to excuse its nonperformance because of legal impossibility nonetheless show "diligent efforts" to perform); *id.* § 261 cmt. d, illus. 11 (establishing that performance is not impracticable if a party, "in breach of his duty of good faith and fair dealing . . . makes no effort to obtain a variance" from the legal obstacle, if there is reason to believe such action could make performance possible); *Krulewitch v. Nat'l Importing & Trading Co.*, 186 N.Y.S. 838, 840 (N.Y. App. Div. 1921) (World War I embargos did not excuse failure to perform duties under shipping contract where obligor could have

shipped the goods to another port). This showing must be made by the party

claiming impossibility—here, PDVSA.

PDVSA failed to establish that OFAC would consider payment to

alternative bank accounts or in alternative currencies to be a change that would

render debt "new" under E.O. 13808. When cross-examining Barker, PDVSA's

OFAC expert, at trial, counsel for Dresser-Rand asked whether hypothetical

administrative changes could make PDVSA's debt "new." *See* App'x at 1039

(changing the mailing address of the administrative agent); *id.* at 1040 (changing

the receiving bank account following a merger); *id.* at 1041 (adding an additional

required notice party). In response to each hypothetical, Barker responded that

he would "take it to OFAC" to clarify whether such administrative changes

made the debt "new." App'x at 1040. But, as elucidated by the court, Barker was

never "willing . . . to state an opinion that it [would conclusively become] new

debt." *Id.* at 1042. Dresser-Rand's expert, on the other hand, testified

unequivocally that, in her opinion, changing the currency of payment or

receiving bank would not make the debt "new." *Id.* at 862–63, 865–66. PDVSA

also points to no additional evidence in the record to show that payment of the

debt in Euros or to an alternative bank account would have been impossible

under E.O. 13808. PDVSA therefore failed to make an affirmative showing that

such administrative changes would have caused OFAC to consider the debt

"new" and that attempting repayment would therefore have been futile.

Despite arguing that OFAC would have determined that these

administrative changes rendered the debt "new," the record is devoid of any

evidence that PDVSA expressed this concern to Dresser-Rand, sought additional

OFAC guidance on the subject, or attempted to make payment to any of the

available alternative bank accounts. Far from proving "that it took virtually

every action within its power to perform its duties under the contract," *Health-*

*Chem Corp.*, 915 F.2d at 810, PDVSA took very little action, a failing that it

retrospectively attempts to excuse. This is insufficient to prove impossibility.

At bottom, the evidence demonstrates that PDVSA never attempted

payment to a different bank or in an alternative currency, nor did it investigate

whether this manner of payment would have been truly impossible. Instead of

doing what Barker recommended—taking the question to OFAC—PDVSA, the

evidence shows, did nothing. PDVSA cannot benefit from the impossibility

defense on speculation, but that is what it asks us to allow here. Accordingly,

PDVSA failed to prove at trial that "it took virtually every action within its

power to perform its duties under the contract," *id.*, and show that payment was "objectively impossible," *Kel Kim Corp.*, 519 N.E.2d at 296.

## IV. PDVSA Has Forfeited Any Argument Regarding Post-Judgment Interest

Finally, PDVSA asserts that the district court incorrectly calculated post-judgment interest. But PDVSA failed to present this argument to the district court and has therefore forfeited the challenge.

"[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) (per curiam) (alteration in original) (citation omitted). While we have some discretion to consider forfeited arguments, "[w]e will generally not . . . exercise our discretion where the forfeited argument was 'available to the parties below and they proffer no reason for their failure to raise the arguments below.'" *United States v. Gomez*, 877 F.3d 76, 95 (2d Cir. 2017) (citation omitted); *see also Dresser-Rand Co.*, 2021 WL 2878936, at *3 (deeming an argument raised at an earlier phase of this litigation forfeited when it "was not fully briefed below [and] the District Court [did not] have an appropriate opportunity to consider it in the first instance").

PDVSA does not point to any document that it filed in which it presented its arguments regarding post-judgment interest to the district court for consideration. Instead, PDVSA acknowledges its failure but argues that the delay is justifiable. *See* Reply Br. at 24–25 ("[T]he parties agreed upon the interest rates in advance of trial and it was only after the entry of judgment that PDVSA determined that [Dresser-Rand] did not faithfully apply the parties' agreement."). But even if this belated revelation would excuse PDVSA's failure to raise the issue prior to the district court's imposition of judgment, it does not justify PDVSA's failure to make any form of post-judgment motion to the district court prior to raising the issue with this Court on appeal. PDVSA has thus forfeited any such arguments relating to the calculation of post-judgment interest.

## CONCLUSION

We have considered PDVSA's remaining arguments on appeal and conclude that they are without merit. For the reasons explained above, we therefore AFFIRM the judgment of the district court.